UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO.

| | |
|---|---|
| CHRISTINE CANADA | ) |
|     Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| LIFE INSURANCE COMPANY OF NORTH | ) |
|     AMERICA | ) |
| NEW YORK LIFE INSURANCE COMPANY | ) |
|     Defendants | ) |

# **COMPLAINT**

## **Introduction**

This is an ERISA claim to recover long-term disability benefits and to reinstate life insurance benefits against plans administered by Life Insurance Company of North America and New York Life Insurance Company and to recover attorney's fees and costs allowed under the ERISA statute. This suit is an example of abuses where "the insurance industry found it could largely immunize itself from suit due to the Employee Retirement Income Security Act ("ERISA")." *United States v. Aegerion Pharmaceuticals, Inc.*, 280 F. Supp. 3d 217, 226 (D. Mass. 2017). The only physicians who disagree are non-examining file reviewing physicians retained by vendors who regularly provide services to insurance companies.

1

## PARTIES

1. Plaintiff Christine Canada ("Ms. Canada"), is an individual having a usual place of residence at Abington, Plymouth County, Massachusetts.

2. Defendant Life Insurance Company of North America ("LINA") is a stock insurance company having a usual place of business at 51 Madison Avenue, New York, New York. LINA is authorized to engage in the business of insurance under the laws of the Commonwealth of Massachusetts as a licensed foreign insurance company and is doing business in the Commonwealth of Massachusetts.

3. Defendant New York Life Insurance Company ("NY Life") is a mutual insurance company existing under the laws of the state of New York. New York Life Insurance Company has an office at 1700 West Park Drive, #250, Westborough, Worcester County, Massachusetts. New York Life Insurance Company administers the plaintiff's claim after New York Life Insurance Company acquired Cigna Group Insurance's group life and group disability insurance business, now named New York Life Group Benefit Solutions ("NYLGBS").

## JURISDICTION AND VENUE

4. This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1337 and 29 U.S.C. § 1132(e) (ERISA § 502(e)). Ms. Canada's claims "relate to" "employee welfare benefits plan[s]" as defined by ERISA, 29 U.S.C. § 1001 et seq. and the subject benefit plans constitutes "plan[s] under ERISA."

5. The ERISA statute, at 29 U.S.C. § 1133, as well as the Secretary of Labor regulations, at

    29 C.F.R. § 2560.503-1 provide a mechanism for administrative or internal appeal of benefits denials. In this case, those avenues of appeal have been exhausted and this matter is now properly before this court for judicial review.

6. Ms. Canada filed a timely appeal.

7. Ms. Canada has administratively exhausted her obligations under each benefit plan and the Secretary of Labor ERISA claim regulations.

8. The ERISA statute, at 29 U.S.C. § 1133, a Venue is proper within the District of Massachusetts under 29 U.S.C. § 1132(e)(2) because LINA and New York Life doing business here and Ms. Canada resides in this Judicial District.

## FACTS COMMON TO ALL COUNTS

9. Beginning in June 2014 Brown & Brown, Inc., employed Ms. Canada as a client service representative.

10. Brown & Brown, Inc., provided long-term disability benefits to its employees, including Ms. Canada under a long-term disability plan ("LTD plan") fully insured by LINA.

11. The LTD Plan is administered by LINA and NY Life.

12. Ms. Canada's Regular Occupational duties at her employer required:

**JOB SUMMARY:**
Under the general supervision of the Account Manager, performs a variety of complex administrative, customer-service related duties and tasks in the coordination of claimants' SSDI claims/files in conformance within established SSAD guidelines

**ESSENTIAL FUNCTIONS:**
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. Reasonable accommodations may be made to enable qualified individuals with disabilities to perform the essential functions.

- Acts as primary point of contact regarding all aspects of the SSDI process and maintains a set number of assigned claimant files from intake through all levels of the SSDI adjudicative process.

- Documents all communications to claimants and insurance companies. Maintains effective data input into WebCheck system and provides routine updates to claimants and clients.
- Communicates, guides and coordinates with all assigned claimants for receipt of all critical and required documents, correspondence and relevant paperwork. Explains key concepts to ensure claimant understanding. Establishes open communication to ensure file accuracy.
- Communicates routinely with SSA during the adjudication process to ensure proper administrative process is followed and pertinent information is remitted timely to SSA.
- Orders medical records and all related supporting reports from identified medical treating sources (i.e.: hospitals, doctors' offices, facilities, etc.) to develop claimant files. Proactively follows-up to ensure commitment from medical sources for receipt of medical records and questionnaires. Makes certain that reasonable and/or state-regulated fees are charged.
- Develops claimant files to ensure compliance with SSAD standards for hearing development. Submits medical records to SSA.
- Maintains effective, on-going communication and develops favorable rapport with assigned claimants and internal team members.
- Performs claimant conversion work components function as required by Account Manager, including follow-up on representation forms.
- Other duties as assigned

SECONDARY COMPONENTS:
- Suggests and designs improvements to operational activities/ procedures.
- Provides back-up to other CSR team members, as necessary.

EDUCATIONAL DEVELOPMENT OR EQUIVALENT:
- Associates Degree or experience to two years of college level courses
- Minimum one-year experience in customer service and/or insurance related work environment with heavy customer service focus

WORKING DEMANDS:
- Ability to perform work with extreme detail and accuracy
- Ability to manage multiple priorities within tight deadlines
- Effective problem solving skills utilizing sound judgment
- Excellent communication skills - both verbally and in writing
- Computer proficiency in Microsoft Office products
- Strong analytical skills

- Ability to work successfully in a team environment
- Ability/willingness to project a professional image consistent with company/client expectations

CORE VALUES AND OUR STUNNING TEAMMATES:

Our objective as an employer is to create a transparent, respectful, and spirited environment where people are rewarded with opportunity and recognized for giving their personal best on behalf of themselves, the company, and our constituents. Our culture deeply rooted in our core values, which includes creating opportunity, enriching lives, and growing through innovation. We have teammates that model and take responsibility for creating an organization that upholds the following core values.

- Create opportunities:
    - We listen intently to our team members' ideas & suggestions and include them in the process when their ideas are implemented.
    - We reward deserving team members with promotions and project opportunities that will drive the business forward.
    - We provide an environment for continuous learning and the ability to develop personally and professionally.
- Enrich lives:
    - We build trusting and transparent relationships by setting clear expectations and following through on commitments.
    - We encourage deserving teammates to grow and learn new skills and expertise.
    - We compensate fairly and, when appropriate, we pay for over performance.
- Grow through innovation:
    - We find ways to attack challenges and create fast solutions.
    - We find ways to accommodate our teammates' professional interests.
    - We utilize technology to enhance our teammates' work experience, allowing them to drive value instead of process.

PHYSICAL REQUIREMENTS

Sedentary work: Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. Physical requirements on a regular basis of this role include:

- Fingering: Picking, pinching, typing or otherwise working, primarily with fingers rather than with the whole hand or arm as in handling.

- Talking: Expressing or exchanging ideas by means of the spoken word in which one must convey detailed or important spoken instructions to others accurately, loudly or quickly.
- Hearing: Perceiving the nature of sounds at normal speaking levels or without correction. Ability to receive detailed information through oral communication, and make fine discriminations in sound.
- Visual: Required to have close visual acuity to perform an activity such as: preparing and analyzing data and figures; transcribing; viewing a computer terminal; expansive reading.

The **Client Service Representative** is a non-exempt position with 5% travel requirements.

13. Due many impairing medical conditions, Ms. Canada has not been able to work full-time in her regular occupation or another occupation but has been able to work part-time.

14. On April 13, 2018, Ms. Canada filed a claim for disability benefits.

15. Under the LTD Plan:

    *The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either: 1. Unable to perform an or all of the material and substantial duties of his or her Regular Occupation; or 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.*

    *After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is: 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or  2. unable to earn 80% or more of his or her Indexed Earnings.*

16. LINA paid long-term disability benefits to Ms. Canada for almost two years.

17. LINA terminated long term disability benefits by letter dated July 16, 2020.

18. On July 16, 2020 LINA advised Ms. Canada she only had 180 days to appeal the adverse-benefit determination which was a material misrepresentation.

19. LINA failed to advise Ms. Canada that both the United States Department of Labor and United States Department of Treasury had suspended ERISA appeal deadlines by a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus

Disease (COVID-19) Federal Register Doc. 2020-09399 Filed: 4/30/2020 11:15 am; Publication Date: 5/4/2020]

20. The Department of Labor continued the appeals deadline suspension several times.

21. On February 18, 2022, the President of the United States declared Continuation Of The National Emergency Concerning The Coronavirus Disease 2019 (Covid-19) Pandemic as described in [Federal Register Doc. 2022-03972 Filed: 2/22/2022 11:15 am; Publication Date: 2/23/2022]

22. To date the President of the United States has not declared an end to the National Emergency Concerning the Novel Coronavirus Disease (COVID-19).

## **LINA'S CONFLICT OF INTEREST**

23. At all relevant times, LINA and NY LIFE have been operating under a financial structural conflict of interest as LINA and NY Life are is liable for benefit payments due to Ms. Canada.

24. The financial conflict of interest influenced LINA's and NY Life's decision making.

25. This conflict of interest is exhibited by the history of biased claims administration by LINA and its related companies.

26. On June 20, 2006, the California Department of Insurance issued a report and market conduct examination finding that LINA has improperly denied long-term-disability claims. A copy of the reported is attached as EXHIBIT A.

27. On June 4, 2012, the California Department of Insurance issued a follow-up report about claims handling by LINA that detail how LINA continues to improperly deny long-term-disability claims. A copy of the reported is attached as EXHIBIT B.

28. On May 13, 2013, the Massachusetts Division of Insurance and other state insurance regulators signed a regulatory settlement agreement ("RSA") with LINA and other subsidiaries of CIGNA, the predecessor holding company to the current company, New York Life, regarding its practices relating to handling long-term-disability claims. A copy of the RSA is attached as EXHIBIT C.

29. LINA paid at $250,000 fine to the Commonwealth of Massachusetts in connection with signing the RSA.

30. Upon information and belief, CIGNA Group Insurance is a d/b/a of CIGNA as it decided the claims of LINA.

31. Upon information and belief, CIGNA Group Insurance used the same employees for LINA claims and appeals.

32. Because the claims and appeals of LINA were decided by CIGNA Group Insurance, the findings of the California Department of Insurance about LINA also apply to LINA.

33. The California Department of Insurance determined that LINA:

a. Failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies;

b. Failed to effectuate prompt, fair and equitable settlement of claims in which liability had become reasonably clear;

c. Failed to represent correctly to claimants, pertinent facts or insurance policy provisions relating to a coverage at issue;

d. Attempted to settle claims by making a settlement offers that were unreasonably low; and

e. Failed to include a statement in its claim denial that, if the claimant believes the claim has been wrongfully denied or rejected, he or she may have the matter reviewed by the appropriate State insurance agency/department.

34. Underlying these findings were the facts that LINA:

a. Applied arbitrary deadlines for submission of proof of claim after the notice of claim had been denied. If the proof was not available or received within the designated period, then the claim was denied and pushed to the appeal process;

b. Failed to request medical records prior to making a claim determination;

c. Failed to perform any functional testing or peer review of medical records on file while utilizing functional test results as the guidepost for medical information necessary to the entitlement of benefits;

d. Failed to consult with a health care professional with appropriate training and experience in the field of medicine involved in the medical judgment;

e. Improperly used attending physician's statements to support its denial of disability while not clarifying with the attending physician why he/she was indicating continuing disability;

f. Failed to perform a transferable skills analysis and labor market survey to identify alternate occupations appropriate to claimants under an "any occupation" policy;

g. Ignored substantial information introduced after the claim denial;

h. Failed to investigate the course and nature of a claimant's disabling condition as it related to the first date missed from work and the end of the waiting period;

i. Assumed that alternate employers could accommodate for a claimant, but provided no documentation to support this assertion;

j. Denied claims based on a "national economy" definition when it was supposed to evaluate a claimant's disability from his/her "own occupation";

k. Failed to consider the course and nature of an illness before denying benefits;

l. Ignored the medical assessments of its own medical health professionals, who determined that the claimants were disabled, and denied benefits;

m. Removed several disabling health conditions from a claimant's history on file before requesting an internal health care professional to review claimant's file;

n. Ignored correspondence received after the initial denial that reasonably required a response;

o. Failed to clarify a claimant's restrictions and limitations with the attending physician who determined the claimant was disabled; and

p. Failed to provide complete information in the file to the health care expert performing a peer review of the medical file.

35. Under the market conduct studies and agreements, it is alleged that LINA failed to

a. obtain, consider or reconcile the complete Social Security Disability Income (SSDI) records relating to an award of SSDI benefits.

b. obtain complete medical records.

c. use the claimant's occupational duties as the occupational benchmark for an "own occupation" evaluation.

d. perform Independent Medical Examinations.

e. institute procedures to correct deficiencies relating to the definition of disability.

f. use the proper medical specialist to review the medical records.

36. These deficiencies show that LINA has a history of biased claims administration.

37. The May 13, 2013 Massachusetts Division of Insurance RSA made similar findings to the California Division of Insurance.

38. LINA continues nationwide, for example, to ignore SSA findings of disability.

39. A Circuit Court of Appeals decision discussing LINA's failure to reconcile SSA decisions and its own contrary determination is in *Raybourne v. Cigna Life Ins. Co. of New York,* 700 F.3d 1076 (7th Cir. 2012).

40. LINA has failed to try to reduce potential bias and to promote the accuracy of its benefit determinations.

41. As the California Department of Insurance determined, LINA ignored the consistent discrepancy between its peer reviewers and Plaintiff's treating doctors regarding Plaintiff's condition; ignored the evidence submitted supporting Plaintiff's diagnoses; and ignored substantial evidence submitted after the initial denial from Plaintiff's treating physicians.

42. In doing so, LINA was probably looking at the financial burden of Plaintiff's claim, rather than provide a full and fair review of his claim, which allowed its conflict of interest to dictate its decision to deny to Plaintiff benefits.

43. Effective December 31, 2020, New York Life Insurance Company acquired Life Insurance Company of America. A copy of the affidavit of Paul Nowak a corporate Vice President o of New York Life is attached as EXHIBIT D.

44. Given that LINA and NY Life pay benefits from their own assets and makes claims decisions, each time that LINA and NY Life deny benefits each saves itself monies.

## FIRST CAUSE OF ACTION
## FOR PLAN BENEFITS UNDER 29 U.S.C. § 1132(a)(1)(B)

45. Ms. Canada realleges the preceding paragraphs and incorporates the same by reference as if fully set forth herein again.

46. This Court must conduct a plenary proceeding in evaluating LINA's, NY Life's and the LTD Plan's decision to deny benefits.

47. The decision to deny LTD benefits was not supported by substantial evidence was wrongful and not in compliance with laws.

48. ERISA section 503, 29 U.S.C. § 1133, provides that "[i]n accordance with regulations of the Secretary, every employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for full and fair review by the appropriate named fiduciary of the decision denying the claim."

49. As part of the regulatory framework, the Secretary's regulation creates three intertwined rights to protect the ERISA plan participant.

50. First, the participant has the right "to submit written comments, documents, records, and other information relating to the claim for benefits." § 2560.503-1(h)(2)(ii).

51. Second, the participant has the right to receive, when requested, "reasonable access to, and copies of all documents, records, and other information relevant to the claimant's claim for benefits." § 2560.503-1(h)(2)(iii). A document is relevant if the document "(i) was relied upon in making the benefit determination"; or (ii) "…generated in the course of making the benefit determination…" § 2560.503-1(m)(8).

52. Third, the participant has the right to require the ERISA fiduciary to consider "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." § 2560.503-1(h)(2)(iv).

53. LINA's and NY Life's claim guidelines (Policies and Procedures) require following the law.

> **3.0 Purpose of Policies and Procedures**
>
> The Policies and Procedures (P&Ps) provide guidelines for the manner in which NYL GBS administers disability claims. They contain administrative processes and safeguards designed to promote the goal of consistent claim administration across similarly situated claims in accordance with applicable federal and state regulations and the governing policy/plan provisions.
>
> The P&Ps are not intended to be a set of absolute rules. Claim professionals are expected to use their experience and judgment in applying the P&Ps to the administration of a particular claim. Exceptions may be necessary due to a claim's particular circumstances, or applicable plan provisions. If there is any inconsistency between the policy/plan, and the information in these procedures, the policy/plan will govern.

54. During the presuit appeals process, LINA and NY Life generated a transferable skills analysis report.

55. LINA did not share that report for comments before closing the record which was in violation of the United States Department of Labor ERISA claims regulation to the prejudice of Ms. Canada who did not have an opportunity to respond.

56. During the presuit appeal process, LINA and NY Life generated a report by a physician and did share that report for comments before closing the record which was in violation of the United States Department of Labor ERISA claims regulation to the prejudice of Ms. Canada who did not have an opportunity to respond.

57. Because LINA and NY Life materially failed to afford Ms. Canada full and fair review under ERISA, Ms. Canada submitted additional material, after she secured counsel.

58. Both LINA and NY Life refused to look at medical records and a functional capacity evaluation which demonstrated that both LINA and NY Life had incorrectly terminated benefit payments.

59. Because of LINA's NY Life's and the LTD Plan's refusal and failure to pay to Plaintiff disability benefits provided to Plaintiff and to those participants totally disabled, Plaintiff may have relief against LINA and NY Life to recover benefits due to her under the LTD Plan, and to enforce his rights to benefits under the LTD Plan, and to clarify his rights to future benefits under the LTD Plan under 29 U.S.C. § 1132(a)(1)(B), and other employee benefits dependent on receipt of LTD Plan benefits.

## SECOND CAUSE OF ACTION

## UNDER 29 U.S.C. § 1132(g)(1)

60. Plaintiff realleges the preceding paragraphs and incorporates the same by reference as if fully set forth herein again.

61. As LINA, NY Life and the LTD Plan have unlawfully denied benefits to Ms. Canada, and have caused Plaintiff to incur attorneys' fees and costs, and will cause her to incur additional fees and costs.

62. Plaintiff may recover under 29 U.S.C. § 1132 (g), costs, including reasonable attorneys' fees and interest at the Massachusetts statutory rate of 12% simple interest per annum on all back due benefits.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Christine Canada demands relief and judgment, jointly and severally against all Defendants:

A.  Under ERISA for an equitable sum of money to be determined by this Court, plus pre-judgment interest (at no less than the Massachusetts statutory rate), post-judgment interest, costs, and reasonable attorney's fees allowed by statute or otherwise.

B.  Injunctive relief declaring the rights and duties of the Plaintiff and Defendants regarding past benefits owed to the Plaintiff, and future benefits to be paid to the Plaintiff, and reinstate of life waiver of premium benefits.

C.  For an order precluding Defendants from using offsets in the LTD Plan because of its unclean hands.

D. In the alternative, remanding the adverse-benefit determination to Defendant to be decided again with an order requiring "full and fair review" under ERISA, 29 U.S.C. §1133(2).

E. Under 29 U.S.C. § 1132 (g), costs, including reasonable attorneys' fees and interest at the Massachusetts statutory rate of 12% simple interest per annum on all back due benefits.

F. For such other legal or equitable relief as this Court deems just and proper.

        **CHRISTINE CANADA.**
        By her attorney,

        */s/ Jonathan M. Feigenbaum*
        _____
        Jonathan M. Feigenbaum, Esq.
        B.B.O. #546686
        184 High Street
        Suite 503
        Boston, MA 02110
        Tel. No. : (617) 357-9700
        jonathan@erisaattorneys.com